v. DuPont Specialty Appellate Numbers 20-3179 and 20-3480. Thank you, Judge Schwartz. Judge Schwartz, may it please the court, Michael Keneally on behalf of DuPont, I'd like to reserve three minutes for rebuttal. I'll be granted. The board committed several legal errors in this case. The first error was requiring DuPont to engage in decision bargaining before it switched from an understaffed team of emergency response volunteers to a team of dedicated and well-trained professionals. Could I ask you just a question about what the state of affairs are right now at the plant? Like, who's fulfilling the ERT duties currently? My understanding, Your Honor, is that the outside emergency response team, the FDM team, is performing and has been performing since September 1st, 2018. And has there been any bargaining about that at all? No, Your Honor. There was a new collective bargaining agreement that took effect on the same day. The bargaining for that did not cover this issue, and the union did not want to engage in effects bargaining about this question. So the current state of affairs is the subcontracted entity is providing the services, am I right? Yes, Your Honor. If the court were to order bargaining, hypothetically, order bargaining sustaining the finding of the NLRB, during that bargaining period, would the subcontracting entity still continue to provide the services until there was either an agreement or bargaining to impasse? Is that what mechanically would happen, like as a result of a ruling here? I don't actually know, Your Honor. I mean, there is a separate stage in the NLRB proceedings on implementing a remedy in this kind of a decision bargaining case, and that can include things like finding out the right amount of a make-all payment and also whether rescission is appropriate. And at this stage, I don't know exactly what that would look like. And I don't know, you know, I think, I guess we're getting up to the point where the contract, the original three-year contract might be coming up for renewal. I don't know the facts on the ground. The reason why I'm asking this question is the remedy that was recited by the ALJ and adopted by the NLRB included what you've described as a make-all remedy, sort of like making sure those employees that would have fulfilled these duties get their missed overtime opportunities by way of compensation, but that the ERT would continue its activities. So you're saying that an award of money has not occurred yet? That's correct, Your Honor. But that could have been one of the things that we would have talked about in a fax bargaining. That's what a fax bargaining typically is. It refers to, you know, in a case where, unlike this case, the employees are actually laid off, there could be severance payments negotiated in fax bargaining like that. And that could have been something we covered in the 2018 collective bargaining agreement negotiation. But none of that happened here. Okay. So back to where you were probably going is this case is all about what was the motive, right? Why is it that a subcontracting entity was brought in to do this work? That's the core of what we have to figure out, correct? I would say there are two parts here. One is what's the standard for figuring out, in a case where there might be multiple motives, what you need to show at the board to establish the foundation. And then what are the facts here about what the motives were? Or whether there was substantial evidence to the finding about what the motive was. Is that what you're talking about? Yes, of course, Your Honor. So the motive, or when you say the standard, are you talking about, does it have to be the sole motive, the primary, the principal, the prompting? Is that what you're talking about in that first bucket? That is what I'm talking about. Right, so your briefing says it should be the sole motive. Correct. How is that squared with our furniture renter's case, which tells us we need to look at whether there was a circumstance where the union could control or participate in or remedy or address the concern of the employer? There's no sole motive test. There's no doubt that if the only motive was cost, that's what Dorsey Traylor says. But Dorsey Traylor doesn't say it's the only time that subcontracting needs to be bargained. Correct? I'm sorry, Your Honor. Dorsey Traylor says if it's the sole motive, it's sort of indicative because it's not what the case actually dealt with. I disagree with that, Your Honor, but I'm sorry to interrupt. Okay. The sole motive, which you claim, is the Dorsey Traylor's test. Correct? Yes. Okay. How could that be the test when Dorsey Traylor didn't hold that and, in fact, furniture renters speaks in terms of a broader view? Well, I agree with Your Honor, but the key question under First National Maintenance and furniture renters in all these cases is whether the subject is amenable to resolution to collective bargaining. I agree with that. So let's talk about this. A couple of things that were brought up by Mr. Lockhart and others included – well, let's step back. Since 1974, the union has been providing these services to the ERT. At some point, Mr. Lockhart is looking at staffing concerns, and what I understand from the record is seeing a few things. Insufficient number of people are volunteering, and those who have volunteered don't have the capabilities to qualify past the test, et cetera. Isn't that the type of thing that, at the bargaining table, the employer could turn to the union representative and say, hey, look, we're not getting enough volunteers. If you folks want to keep this as a benefit, an opportunity for your ranking file, go get us more volunteers. And why don't you start identifying some folks who can actually fulfill these duties? Isn't that just a proper and a very effective way of being able to solve the problem and have a conversation to identify people who could do the job? Your Honor, we know that that wouldn't have worked here because that had been attempted in the years leading up to Mr. Lockhart's hiring and decision-making. There had been a mandatory overtime system where anybody eligible to – or anybody who's already passed the certification requirements would have to be on a list and fill in spots, but this problem, as Chief Lockhart testified, was getting worse because a lot of the most qualified and experienced, the longtime members of the team, were retiring or moving on to different shifts when they didn't have vacancies. And this is all laid out in Appendix 5 in the ALJ's decision itself under the heading of ERT problems. And so these are not the kinds of things that could have been solved through collective bargaining because they hadn't been solved through collective bargaining up until this point, and they were getting worse. And I actually think – Did anyone testify to the ALJ? We tried to talk to the union about this, but we just couldn't make it work because I don't remember any testimony on that front. And we do have record evidence that there was a bargaining history on these subjects. So if the issue of staffing and training were the real concerns and they couldn't bargain, why wasn't that shared with the ALJ? No, I think that that was shared with the ALJ, and we argued that these staffing concerns were not simply labor costs or indirect labor costs, but they actually do go to safety. I mean, it's not a counterintuitive proposition that if you have vacancies on your emergency response team, safety is at greater risk, and there's no dispute that the decision here to switch to professionals actually was a step up in terms of safety, I think it's fair to say. Was that a driving force in this idea of bringing in an outside force to address the problem? Absolutely, it was a driving force. A driving force, the staffing. In other words, you couldn't get enough people from inside to do that. Absolutely. The ALJ actually treated it as a consideration. On page 15 and 16, he refers to the staffing issues of 15 and 16 of the appendix, but he treats that as a labor cost, which is citing the furniture renter's decision that this court then refused to enforce, and he notes Is it merely a staffing issue? I thought your argument was that it's a matter of getting experienced and qualified staff. That's exactly right. You're right, Your Honor. It is not just a matter of finding bodies. It's finding the right people who are committed to the job as a second job in this case and also who can pass the certification test and who can get experience in the problem here, and this is, again, in Appendix 5 of the ALJ's decision, is that there aren't, thankfully, a whole lot of emergency situations at the site, and so getting real-world, on-your-feet experience in how to deal with them is very difficult. It's not impossible. Did those problems manifest themselves? They did, Your Honor, at times. I can give you an example. There was testimony and there's documentation of a problem where one of the volunteers applied baking soda to an acid exposure on one of the workers' skin, and that was inconsistent with the EMT guidelines, which were to use water instead, and that was something that got written up as a response, and Chief Lucard testified about. And so these issues do come up. Thankfully, there hasn't been, you know. It sounds like an isolated problem, though. Well, that might have been an unisolated problem, but, again, we're dealing with a situation where the people who are staffing the emergency response team under the former model are not doing this as their full-time jobs. It's not what they entered their profession to do, but the emergency response team that was hired, that is exactly what they have decades of experience in all sorts of certifications, and then they do this as just a full-time job. Another important point on this practical issue, and this was testified to by the union's representative, Mr. Irvin, as well as reflected in the documentation, is that the former model volunteers often had to wait to be relieved from their normal duties to respond to an alarm because they were not just sitting in the firehouse like the professional team is waiting for the call. They were making Kevlar and Tyvek and all the other products that DuPont makes, and if they were doing something that they couldn't just walk away from at the time, they did need to wait for relief. And so – You described the staffing, because we're in substantial evidence land, right? Our standard of review is we're quite restricted. You agree, right? On the review of the record, yes. Right, okay. So you described staffing or qualified staffing or however – whatever descript you want to – appropriate staffing as a driving force. How can we conclude under this very deferential substantial evidence test at the ALJ's conclusion that labor-related issues was a driving force, an equal driving force? If there's two equal under a substantial evidence, if there is nothing that blares out as contrary to the record, aren't we duty-bound to accept that conclusion? Well, and this is why I think the legal test is actually really important. To go back to Your Honor's question about Dorsey trailers, I don't think it's just dicta in Dorsey trailers because in Dorsey trailers, the NLRB had actually held that labor costs – and this is a quote from the NLRB decision in that case – labor costs were a factor in the respondent's decision. That's 321 NLRB at 617. And this court didn't displace that finding, but that did say that that wasn't enough to trigger – to put the case within Fiberboard subcontracting, that area where all you're doing is really trying to replace people who are going to do the same work for a cheaper cost because they're not affiliated with the union. And that's where I think the sole motivation standard comes from, and I think that's why it's not dicta in Dorsey trailers. But that statement may simply be illustrative rather than exclusive. Well, it's possible, Your Honor, that there could be a situation between any consideration of labor costs versus only consideration of labor costs. Here, however, the ALJ didn't try to find like a middle point and say that that was where he was putting this case. He said, in words that are exactly the same as the Dorsey trailer words, that labor costs, specifically overtime and training labor costs, were manifestly a factor in the decision to contract out. And that is not the law. We cited the Arrow Automotive case in this court and in the NLRB proceedings where the Fourth Circuit held that labor costs are inescapably a part of the economic picture when companies are making decisions like this. And so the question is, where do you draw the line between the types of decisions where labor costs are sufficient enough that the union might be able to resolve them versus the kinds of cases where labor costs may be an added benefit, which is what we submit with the situation here, but are not the only motivation and may not be even the most important motivation. Is it enough for there to be this other core business motivation, or does it need to be primary under our case law as the motivating force for contracting decisions? Well, under your case law, I can only find – we really only have furniture renters and Dorsey trailers, I think, Your Honor. Furniture renters did say that you cannot treat – part of the issue is where are we going to draw the line between some labor cost consideration versus none, and part of the issue is what counts as a labor cost in the first place. Furniture renters is clear, I think, that not every employee performance issue counts as a labor cost. In that case, it was employees who were stealing and otherwise engaging in misconduct. Here, I think we would argue and have argued that being able to provide the best safety services – safety-related services possible is also not the kind of thing that counts as a mere labor cost. And then Dorsey trailers, I think, gets more at the other question, which is where is the line between a permissible amount of consideration of labor costs versus an impermissible amount. And there, all I can tell you is what the facts were in Dorsey trailer, which were that the employer was looking to fill an understaffing problem, but it wasn't emergency responders, it was welders. And the court said that that was an economic reason, but not an impermissible labor cost reason, because otherwise you're not going to be filling orders. I would think this case should be an easier one, because rather than just trying to make sure we were filling our product orders, we were trying to make sure we could have the best emergency responders that we could get. Does your success rise or fall on the sole motivation test? No, Your Honor, I don't think that we need to establish that. I think it would be enough for the court to agree with the Fourth Circuit that labor costs – and I think also it's implicit in Dorsey trailers – that labor costs – the mere consideration of labor costs to some degree, the fact that they're a factor isn't enough to trigger a duty to bargain, because that's all the ALJ found here. The ALJ did not find that they were the main factor or the only factor. But if the court finds that a factor, the a factor standard, or some motivation, I suppose it would be, is not enough, that would be enough, I think, for us to prevail, at least combined with the fact, which I think is really hard to dispute under this court's case law, that concerns about having the best emergency response team that's fully staffed and on call all the time is not merely a labor cost concern. I understand that the matter of safety was a tremendous concern also. Yes, Your Honor. It had to be addressed, and this change was one that would address that problem. Absolutely, Your Honor. All right. That's right. And it's very – and the chief of emergency services, Chief Lucard, testified that his only concern was with safety. He doesn't have profit and loss responsibility. He's not a decision-maker, though, right? Well, he testified that he was sort of the first mover in this decision. But he wasn't the decision-maker, because we have to look at the employer who made the decision. He wasn't the decision-maker. He was presenting his perspective, giving his expertise, his provision, et cetera. But you agree he wasn't the decision-maker. He was not the ultimate decision-maker. I will agree with that, Your Honor. But he was the only person – he was the one who prepared the proposal, and the only evidence – You said labor costs, right, which included labor costs? As a factor, costs were a part of the proposal. But throughout the entire process leading up to the decision – So from your point of view, if an employer has multiple reasons, then it has now shielded itself from having to bargain. Is that your position? Well, no, Your Honor, I wouldn't put it that way. The employer has to have multiple reasons. It cannot be a purely fiberboard situation where only labor costs are motivating the employer. And they have to be bona fide reasons, of course. If it's a sham, that wouldn't work. But it's not shielding the employer. I mean, there would still be an obligation that we'd never contested to bargain about the effects. That could have been something we addressed. So I just think it's – going back to first national maintenance, we have to be engaged in a balancing here between what benefit the collective bargaining relationship is going to receive from a bargaining requirement versus what burden is it going to put on the employer's business. And here I think that the burden that comes from not – from tying an employer's hands and being able to improve the company's ability to respond to life or death emergencies outweighs any benefit that this collective bargaining relationship could have derived, especially when – Well, you could have bargained to impasse. You say tie your hands. All that the law requires is talk about it. You bargain to impasse, right, and then you take your next logical step. But all that – that's all that the obligation is. But that's a big obligation, Your Honor, and there's testimony – Sure, there's a big – it's a big obligation. There's testimony about how that plays out in this setting with these people. At AR-128, Mr. Ervin testified about how the parties had bargained to impasse over the emergency response team in 2008, leading to a walkout of the entire team. And so the employer – That's part of the – that's the whole benefit, the power that gives the parties from bargaining. I understand your position, and I understand the consequences you're referring to. Let me just see if my colleagues have any other questions before we hear from John. Thank you. Just one quick one. Of course. I was looking at a note here that the ALJ found that labor costs play a pivotal role in DuPont's decision to subcontract labor costs. Not so much safety, in other words, but the cost of labor. I have a – I don't have the word pivotal in front of me, but the ALJ did decide that labor costs were a factor, but the problem is that the ALJ referred to this inability to fully staff the team as an indirect labor cost. And that's at page 15 of the appendix, citing the case that this court then refused to enforce furniture renters. And so I think that's a huge mistake to treat the inability to staff a full team of emergency responders as a mere labor cost. I mean, that's a safety issue in a pretty obvious way, I would think. So even if that was a – that, we agree, was a pivotal part of the employer's concern. The change had a substantial beneficial effect in terms of labor costs, did it not? It did have that effect, Your Honor, but so too did the changes at issue in these other cases like Dorsey Trailers and Arrow Automotives. We do have a substantial evidence standard that we need to apply, and we have an ALJ who, among other things, made credibility findings as to Lucard. How do we as a court of appeals deal with those credibility findings that would lead us to believe if taken at face value, that the safety rationale was fabricated for purposes of litigation? I don't think that's what the credibility finding was. I think that the credibility finding was specifically talking about Chief Lucard's concerns about like catastrophe level events arising from particular chemicals. The ALJ referred to it as rote and lead testimony. That was what he was referring to. But the ALJ himself credited the concerns about staffing levels, and as I said before, made those findings on page five about real problems that the employer had been having with the earlier version of our earlier model. And so all of those things are before the court, and the court doesn't need to take issue with whether a specific concern about sulfuric acid, for example, led to Chief Lucard's decision. And there's really no way, even under substantial evidence, to get around the fact that each of the documents, the Q&As that were prepared before the meeting with the union, the PowerPoints that we provided in our briefs, they do refer to some of these safety concerns like having a dedicated team of professionals and having better response times rather than having to leave a current assignment and wait for relief to arrive. But they also do things like put cost at the initial slide and have safety simply as an added or soft benefit. Doesn't that suggest that labor costs were primary? I don't think it does, Your Honor, but it does suggest that labor costs are quantifiable, whereas safety costs are obviously just soft in the sense they're harder. I don't know how you could quantify that. But there are other documents like the Q&As that were provided before the meetings that go in the reverse order. And I think it would be strange to hold that the order of the PowerPoint slides really determines whether DuPont has the ability to make this change without engaging in decision bargaining first. But we do know, though, speaking of documents, there was one document that listed out a variety of considerations, including reduced costs. Then there was an email from somebody at DuPont saying, well, we should be pretty careful about talking about reduced costs. We have a pending unfair labor practices charge in the very next document that was generated omits reduced costs. So doesn't that give the ALJ a basis for some of these adverse credibility determinations that Judge Krauss just made reference to? No, Your Honor, because those documents that you were referring to happened after the decision was made in the posture of pending litigation. And I think it's pretty common for people and companies to be a bit more circumspect and worried about how to – That's a testimony that I believe, and I can't recall who it was attributed to, but a suggestion that we told the union we hadn't crunched the numbers yet. We were at the table, yet we know from the documents they, in fact, had crunched the numbers. But before that, it's all in front of the ALJ, and given our posture as an appellate court, we have to accept those credibility determinations unless they're wholly unsubstantiated, don't we? Well, but, Your Honor, they don't change the fact that the ALJ did not question that there were also references before the decision was made to all of the safety things we're pointing out. So Substantial Evidence looks at the record as a whole, and, you know, if the ALJ is right, those were labor costs deep down, and you just have to have some consideration of labor costs, which are good as a bargain, then I think we're out of luck. But I think those legal errors really have to influence the Substantial Evidence review of the record as well. What do you – on this record, we're asked to evaluate the board's decision, looking at what motivated the decision maker, and what we have before the board, or before the ALJ, seems to stop in terms of testimony at the level of Chief Lucard, where your client made the decision not to put into the record testimony of management, decision makers, the committee that was rendering the ultimate vote to make this switch. How can we – even if we're to credit that Lucard had a bona fide safety interest, and for him it was primary, how could we say that there is Substantial Evidence that is actually undermining the ALJ's conclusion that management was basing its decision on labor costs? The only evidence that anyone put in the record about what management's decision making was based on are these PowerPoint presentations that use both. And I would say that the board's general counsel always bears the burden of establishing that a labor – burden of proof in establishing that a labor practice occurred. Their only witness was Mr. Urban, who had no insight into what the management decision making process was like. And so I think that any adverse inference on that has to weigh against the board rather than us. It does appear that DuPont completely sidestepped the union in this case. Couldn't we say that DuPont had a duty to negotiate with the union in a circumstance like this? Well, again, there's no question that DuPont did offer in good faith to engage in effects bargaining. And then the question was whether it had to do more than that. We've been talking about the antecedent question of whether the duty exists, and then we also raised in our brief the argument of contract coverage that we had already exercised our duty by negotiating over what the union's work jurisdiction is. The contract refers to production and maintenance work. And then also making clear beyond that that even production and maintenance work that would normally belong to the union is something that supervision can perform when needed or when in the interest of safety. And so under the contract coverage doctrine, we submit that that's enough to discharge our duty to decide who gets to make the call about safety-related issues and that that's not something that otherwise the union can block. How could supervision cover an outside contractor? Well, I guess the two points about that, Your Honor, I don't know that there's testimony either way about, you know, who these exempt employees are who are on the ERT team. But under the contract coverage doctrine that the DC Circuit and MD Transportation, the board itself have adopted, the board does not require that the agreement specifically mentioned refer to or address the employer decision at issue if the subject is within the compass of the agreement. And I think any distinction between supervision personally, you know, going to the fire to put it out versus hiring professionals to do that would be one that fits within that, you know, sort of gray area. Because the purpose of the contract coverage doctrine is that if there's a real dispute about whether the contract applies, ideally the party's contract decision resolution process will be enough to solve that rather than require, you know, NLRB litigation every single time. And so we think that's enough, the reference to supervision doing the work, especially when we're talking about production and maintenance work to start with. And this is not production and maintenance work. I don't think one would describe the emergency response professionals as engaged in production and maintenance work when they're responding to these calls. Isn't that a reason we should just set aside the safety provision argument that you're making? Because by its terms it says supervision can perform production or maintenance work, not can perform safety work. It says production and safety, production and maintenance work in the interest of safety. And certainly we don't dispute that the emergency response team is working in the interest of safety. I mean, that's their whole reason. Judge Cross's point is they're not in the interest of production or maintenance. The emergency responders are. I think that's what Judge Cross was talking about. I agree with that, Your Honor, but that is the work that the contract assigns to the bargaining unit. And remember there are multiple unions at this site. Some of the members of the team are members of the electrical union, the IEEW. Some of them are not members of any union. And so this isn't just some subject that's always been exclusively within the work jurisdiction of the ARWI. And I think that's the backdrop that really informs how the court should read that Article 9 that talks about production and maintenance work being performed by supervision in the interest of safety. If we conclude by its plain language that this does not authorize supervision to perform safety work, but rather production or maintenance work, and that there's not reference to the ERT work within the unit scope or the job classifications or wages, then why shouldn't we take under MV Transport that this then defaults to the regular duty, that it is not something that is expressly covered by the contract? Well, I think that would be returning to the clear and unmistakable waiver standard that the contract coverage doctrine was supposed to replace because I think it would be requiring a specific provision that says supervision can hire someone to perform any work in the interest of safety. But if the parties had no reason to expect that that was going to be a real dispute under the contract, they wouldn't need to put in a provision that directly addresses it. And I think here, given the way that the bargaining unit is defined in terms of production and maintenance, and I apologize if I was being unclear before about referring to production and maintenance work, but given the way that the bargaining unit for the ARWI is defined, I think it would be an unrealistic expectation to require a broader non-production and maintenance-specific provision that would cover the whole run of safety-related work. So then it's not covered under that theory, then it wouldn't be covered by the contract, right? It wouldn't be one you reserved as the manager to decide by the contract by what you just said, correct? I agree that there isn't a specific provision that says that supervision can hire whoever it wants for all safety. But I think that's not what the contract coverage doctrine requires because it doesn't require every single possible scenario to be bargained for and expressly provided for in the contract because that's just an impossible standard. And then you would really be requiring clear and unmistakable evidence, I think, of the union's willingness to not insist on that. Any other questions? Okay. Well, here I'm rebuttal. Thanks. Good morning. May it please the Court? Eric Light on behalf of the National Labor Relations Board. I think I'd like to begin just with, I think, a telling concession that DuPont made in the opening argument, which is that DuPont and the union had bargained over this ERT for years, in fact decades, and had actually in recent years been engaged in bargaining over some of the alleged problems with the ERT. And what happened was, in DuPont's view, it was dissatisfied with that bargaining. And so rather than alleging that the parties had reached impasse as required under federal law, the employer simply decided to act unilaterally to cut the union entirely out of the picture, to in fact act in secrecy for several months before informing the union that this decision had even been made, and then to continue refusing to bargain for another several months before unilaterally implementing it in September 2018. Just by way of example, there's some discussion of the stated problem of staffing with the ERT. Even assuming that that was one of DuPont's motivations in making this decision, as the board found in this context that constitutes an indirect labor cost, which is well established under the law going all the way back to, for example, the 10-pin roller bearing case we cited in our brief, which was directly cited with approval by the Supreme Court and Cyber Board. That case was all about the fact that when an employer is having problems finding a sufficient number of qualified employees, the union is often the best entity to talk to and to go to the bargaining table to see if the union can offer solutions. Here the union represented 1,000 production maintenance employees at this facility. Again, there is a long-standing bargaining history. The parties had specifically been discussing the staffing problems. To cite two examples, there had been some discussions, number one, of allowing the permanent day shift to have ERT volunteers, which was something the union had long been advocating. DuPont opposed that. It didn't want to add ERT volunteer positions to the permanent day shift. Number two, there was testimony that the parties had even been discussing potentially requiring this bargaining unit of 1,000 employees to have some level of involvement in ERT, effectively requiring people to volunteer. Those were potential – with the forced overtime. How do you answer the point of your colleague here that these other means of satisfying the safety problem had been tried unsuccessfully, leaving things like open positions for shift captain and pump operator and things that were essential for staffing of a full EMT? Well, I think my point, Your Honor, in citing these examples, is simply to show as support for the board's legal finding that this was a subject which was suitable for bargaining because under the scheme of the National Labor Relations Act, if you are engaged in bargaining and one party is dissatisfied, as DuPont claims that it was here, you have to show that you have reached impasse in bargaining. A party cannot simply take it upon themselves to say, we're tired of bargaining, we don't think it's effective, and we are going to act unilaterally. And the board is not required to find that the union could have come back in this case with specific solutions because neither the board nor the court is really supposed to be supervising for both of the bargaining tables. As the Supreme Court held in Fiber Board, the fact that this is a subject which was amenable to bargaining means that Congress has already made the judgment that the parties have to go through the bargaining process, which requires bargaining, good faith bargaining, to agreement or impasse. But that begs the question. What we have to decide is whether it is a subject amenable to bargaining and what is it here. Because if it's finding staff for the emergency response team that is fully trained, experienced, full-time, dedicated professional staff, that does not seem to be a subject of simple staffing that the union would be capable of addressing. Why isn't that what we have here? Well, Your Honor, first of all, these volunteers, to dissuade any implication that they're unqualified, there were very rigorous training standards. This program had been in effect for decades and many of the volunteers were highly qualified. The problem that is in the record, if at all, is that as experienced employees retired, there was an alleged difficulty in getting new employees to volunteer because this was an entirely voluntary program. And so there was allegedly difficulty in staffing the entire ERT, which was approximately 50 to 60 employees. So, again, my point is not to say that the union had a solution, but merely that this was amenable to bargaining. In fact, there were discussions which had been initially explored and were not fully explored to agreement or impasse, such as requiring more of the 1,000 union representative employees to volunteer. Another example is that there had been discussion about perhaps having supplemental staffing for the ERT by bringing in off-duty local fire department employees. So I'm not proposing a solution to the court. I'm merely, by way of illustration, showing that this was not only a subject amenable to bargaining, but actually a subject that the employer and the union had been bargaining over until the employer acted unlawfully by taking it upon itself to cut the union out of the picture. Why isn't the critical point here, though, that those who were volunteering, you know, as it turned out, in many cases couldn't pass the certification exams and were taking them multiple times? And in the meantime, there were open positions, you know, unstaffed, particularly at supervisor levels for the emergency response team that the new chief of emergency management comes in and determines poses too high the safety risk? Well, Your Honor, I think my response still would be that there were potential solutions which could have been explored at the bargaining table, but to not go too far afield on this tangent, I'd also like to bring the court back to the fact that the board's findings of fact were that the primary motive here was simply saving direct labor costs in the form of overtime and wages to the employees because under the longstanding ERT model, it required the employer to pay a great deal of overtime both for staffing and training, the extensive training that these employees were required to go to so they could be qualified to perform this emergency services work. And so as the board found and as a wealth of documentary evidence shows, the employer was primarily motivated by a simple calculation which to these ballpark figures, the ERT required it to pay approximately $2 million per year to the bargaining employees and the contractor model allowed it to save 50% of that, to receive savings of approximately $1 million a year. And that's what was emphasized to upper management in Mr. Lockhart's PowerPoint presentations. That's what appears as cited in our brief throughout both public and private communications from the employer. Isn't that a reasonable basis on which to make that kind of decision? Yes, it's certainly reasonable, Your Honor. And as the board actually went out of its way to emphasize towards the end of its decision, there's no suggestion that the employer, you know, had some kind of discriminatory or bad faith motive here. This is simply a question of is this a term and condition of employment within the meaning of the National Labor Relations Act? If it is, whatever the employer's motive, no matter how good faith they are, under federal law, it has an obligation to bargain with its employee's chosen union because in the judgment of Congress, those are the type of issues which Congress wants to go through the bargaining process to avoid the kind of industrial strife that can result from the dispute that arose in this case. That's the remedy you seek. Go back to the bargaining table. Yes. Well, the remedy in the board's order here, Your Honor, is primarily make co-relief for the employees, which would be, you know, back pay for the lost overtime opportunities. The board also, consistent with the Supreme Court's decision in Fiverr board, includes a order that the employer restore the status quo ante. But I would note one qualification to the court, which is that the board's unfair labor practice proceedings are typically bifurcated, where there would potentially be a subsequent compliance proceeding even after this court enforces,  And as the board noted on the first page of the decision here, there would at least be a possibility in the compliance stage that the employer could show that restoring the status quo ante would be unduly burdensome for some reason. So that's not, you know, that might not ultimately result from this court enforcing the board's order. That would have to be litigated in compliance. But generally, the board's order is seeking to undo the harms of this unfair labor practice, which was the unlawful refusal to bargain and unilateral decision by compensating the employees and restoring the position of the union to bargain over this with the status quo restored, because in the absence of that, the union would be devoid of all bargaining strength to actually approach the bargaining table as intended. But you're describing the practical, which goes to my very first question to your adversary's concern about practicalities. And I gather what you're saying is if we were to enforce the order, the financial compensation might go forward, but the actual removal of the subcontractor and the restoration of the union members would not happen on a dime. There's another proceeding that would take place before the NLRB. That's correct, Your Honor. And from memory, I believe the standard that the board, I believe it's footnote four on the first page of the board's decision, is that if the employer has evidence that it would be unduly burdensome, which it did not have at the time of the liability phase in that unfair labor practice hearing, which could potentially include that type of evidence, that that could be litigated in compliance before. If I could ask you, you used the word primary motivator. It goes back to your adversary's point about sole motivation, principle, the motivation. What are we looking for? What is the adjective for motivator? Could there be multiple motivations? Yes. Well, not to be too cute, Your Honor, but I think the answer is none of the above, because the legal standard that the board adopted in Torrington Industries does not turn on any particular primary or sole basis. Really what the board was saying there was that when you have the type of subcontracting, which is involved here and was involved in Fiberboard, that is generally a mandatory subject of bargaining. But remember, our court was not embracing Torrington. Correct. Right? So in the Third Circuit, what is it that we should be looking for? What do we look for substantial evidence of, that it was a primary motivator? Well, I don't think this court applies a primary test either, Your Honor. The further qualification I was going to add to Torrington Industries is that this court and furniture renters caution the board not to apply that as a per se rule, that the board still needs to look at the facts of a particular case and see if there are certain non-labor cost motives which would preclude bargaining. And so the excellent example of that is furniture renters itself, where as this court held the employer was motivated by the theft and incompetence of its employees, and it was in fact driven to increase labor costs because it could not continue having its own employees do these deliveries. And so in that case, the board had sort of done some gymnastics to say that that was nonetheless labor costs. And I would agree with DuPont that there are situations where the question of what is labor costs, how broad can that term be, would be at issue. I think that's the primary message of furniture renters. But in this particular case, that's not really at issue, number one, because the board did the very detailed case-specific analysis that this court cautioned the board to do. And number two, the labor costs here could not be more quintessential labor costs. There was essentially a desire to cut wages and overtime by bringing in contractor employees who are performing the exact same work under virtually the same conditions of employment, only they're cheaper and the shifting is a little different. ALJ made some rough comments about the credibility of some of the witnesses and also made some pronouncements about whether a safety concern was really the motivator or if it was the after-the-fact sort of a pretractable thing. Do you think the ALJ credited enough in the record where there was discussion about safety? And safety in this, I don't think there's any dispute that what goes on at this facility where they produce these products carries with it hazards. I don't think that's in dispute. The issue is could people be kept safe, the people at the facility as well as the community? Did the ALJ give enough attention to the evidence on that point? I think so, Your Honor. And I think this also answers your question, Judge Prentice, you had earlier about the role that safety actually played in this decision here. What the board affirming the judge found is, number one, the only individual to testify about safety was Mr. Luckhart. The ALJ discredited that testimony to the extent that Mr. Luckhart said safety was his only consideration and he wasn't even thinking about labor costs. As the ALJ found, number one, his testimony on his face was not credible. Number two, that's inconsistent with the contemporaneous documentary evidence, including these PowerPoint slides he's prepared. The ALJ also noted that although in the PowerPoints, as a soft added benefit, as Judge Krause, you pointed out, there were particular considerations which, you know, at least arguably would go to safety such as vague pronouncements such as having full-time or dedicated workers, what the board noted is that, you know, that does not suggest that that was part of the motive of the upper management when they made this decision, certainly not the way that DuPont has characterized it in its briefing, as though there was concern about the ERT model being unsafe and that there being potential risks of actual harm to employees at this facility for the community. You know, as we point out in our brief, if those had been Mr. Luckhart's concerns or upper management's concerns, you know, it stands to reason that they would have appeared prominently in these presentations to upper management. If I could also just make a legal point, which I think is significant on this issue, it's the employer's burden to show that safety or some kind of non-bargainable subject was its motive here, not the board or the general counsel's burden. That's why it's significant that the employer chose not to call any of its upper decision makers. And in support of the fact that it is the employer's burden, I'd direct the court to furniture renters where the court, I guess in dicta, but the court clearly affirmed the reasonableness of the board's abuse packing test, which was technically not the test that the board applied here because the board has limited that burden shifting framework to relocation decisions. And it has adopted a more lenient test for subcontracting. But I think the facts show here that even if the packing were applied, the board found in substantial evidence supports both that labor costs were at least a factor and that the employer has failed to carry its burden of showing that there were other considerations that were not amendable to the bargain. And I'd also note that the board, the ALJ as affirmed by the board, did have a discussion in his decision where even assuming that safety did play some role, the board found that that would not render this entire decision non-bargainable given the prominent role that labor costs played, and I believe as DuPont has conceded here today, indirect labor costs played such as staffing and those type of things which could have been explored. How can we find on this record substantial evidence that safety was not a concern, that that was fabricated, or that there is no contemporaneous evidence of safety as the motivator when we have throughout the administrative record multiple documents that in some cases explain in detail the safety concerns first, what a professional safety team was going to bring to the table, and then cataloging the problems and safety risks of the current volunteer situation. And at the same time, in Lucard's testimony, exhibits that reflect the kinds of risks that are at issue, things like release of large volumes of chloroform that could reach out a mile and a half, affecting almost 10,000 people. That is the kind of information facing the company, and they also have before them a record where after multiple attempts over years to keep full-time staff of emergency response through the volunteer team, they had not been able to keep a full team. And those who were volunteering were not passing the certification test. Under those circumstances, how could we say that there is substantial evidence supporting the ALJ and board's conclusion that safety was fabricated as a concern here? Yes, Your Honor, and I think I'd refine the inquiry and refine that a bit to say that it's really substantial evidence that the employer had not proven that its upper management was motivated by safety. Certainly, I take Your Honor's point that there is documentary evidence which one could potentially read as going to safety issues. However, I'd note that, number one, certainly the grave safety concerns of this facility have never been disputed. The board has gone out of its way to note that all parties agreed that there are these significant safety concerns. But the ERT model had also been in place for at least half a century and had been shown effective. I would dispute that there's actually evidence that the ERT model had for some reason become ineffective or had begun to create safety issues. The ALJ made a number of findings underlying his ultimate conclusion that this was essentially a pretextual consideration and contract for litigation. Number one, that the employer's thinking of this changed very dramatically after the unfair labor practice charge was filed. When the employer first notified the union bargaining committee at a meeting, as the union officials credited testimony shows, there was absolutely no mention of safety. It was explicitly stated that this was to save costs and to reduce costs. After the union subsequently filed an unfair labor practice charge, that is when, for example, the employer began documenting alleged safety issues after that had happened. But our focus is on the point that the employer is making the decision to substitute the professional emergency response team for the volunteer one, right? And that occurs much earlier. Well, that's correct, Your Honor, but that's communicated to the union, and then immediately after that the union filed an unfair labor practice charge. I think there is very little, if any, evidence that prior to that unfair labor practice charge being filed, there was documentation of safety concerns. Setting aside there is the PowerPoint slide, which generally says faster response times and things like that. But, for example, the documentation of safety issues, that occurred later. There's also the email, which the judge emphasized, where there is an internal email where the employer actually notes that, you know, we need to be careful about stating our reliance on labor costs in this case because of the pending unfair labor practice charge. I understood that that coming later and in the face of, you know, pending complaints, you know, may well be clumsy litigation strategy, but our focus and time is on the earlier period where there's the decision being made. That's correct, Your Honor, and I think that goes to my point, which again is that when that decision was made, there's very little, if any, evidence contemporaneous to then that safety was considered. And also- About things like the administrative record at 621, where there is bulleted out the issues with the current emergency services staffing, inability to staff level of volunteers needed on shifts, difficulty finding candidates for captain and lieutenant roles, training a large number of volunteers, and then still having to staff shifts over time, medical restrictions, special assignments, and performance issues to keep the trained personnel from being able to support shift staffing for periods of time, and inability to consistently get members of the volunteer emergency response to meet the expectations of the role without a lot of oversight and follow-up. Well, Your Honor, I think- Isn't that a contemporaneous document as the decision is being made? Your Honor, I think basically all of those points would, I would argue, go to the staffing issue, which as the board reasonably found, is not actually a safety consideration. Here it is an indirect labor cost because there may have been solutions to staffing that the employer did not want to pursue because it would require additional overtime or other changes that the employer did not want to make. And so I would say there's no evidence that the ERT model in general, you know, in the abstract presented a safety issue that it needs to be replaced. Rather, the employer simply did not want to bargain with the union further over potentially these staffing issues or over labor costs. Why doesn't this go to an error of law, with the ALJ finding that the inability to get specially skilled workers was, quote, a rationale that places the subcontracting decision within the duty to bargain? And we have squarely rejected that in Dorsey Trailers, where we concluded that the employer's need to get specially qualified employees, even if there were also labor costs that were a motivating factor, but that need for qualified, specialized employees was outside of mandatory bargaining. Well, Your Honor, I don't think this court has held that. I actually don't think that was an issue at all in Dorsey Trailers. It was that the ALJ did cite the board's furniture renters case, which was, of course, denied enforcement by this court. But for the general proposition that simply because you're having trouble recruiting employees, that does not render something non-bargainable, that is well supported under board law, including, for example, the Timpton-Rollerburn case, which the Supreme Court has upheld. The board also went out of its way in a footnote here affirming the ALJ to make clear that that can be a consideration which prevents something from being bargainable, including, for example, in furniture renters, where if the qualifications issue is that the bargaining union employees are, you know, engaging in theft of the employer's property and cannot be trusted, that may be the type of consideration that takes something outside the realm of bargaining. But here I would submit that this is much more straightforward. It's not that all 1,000 of these bargaining employees were simply unqualified to perform this volunteer work, which had been going on for half a century. It's that the employer was, you know, having trouble recruiting enough people to volunteer. It could have offered greater incentives. It could have required employees to volunteer. It could have used supplemental non-bargaining unit staffing. None of those solutions were explored, and we would submit that the board reasonably found that that did not remove it from the range of bargaining. And in the circumstance where an employer has the authority to hire specially qualified individuals to fulfill some mission, isn't that usually a circumstance where the absence of them would interfere with the core purposes of the organization? Like, I have to shut down a part of the business. I won't be able to accomplish my business goals. Is that the scenario where that would not be subject to bargaining? But here, ZERT doesn't facilitate the manufacturer. It keeps the place secure, but it doesn't facilitate the manufacturer. Is that a fair cabining of that rule? Well, I think that's an excellent point, Your Honor. I wouldn't foreclose that there would be situations where you could have, you know, on a case-specific fact-by-fact analysis the board may find some other situation which doesn't neatly track that. But I think that goes to sort of the overarching inquiry in FIBER Board, the recipient court decision in FIBER Board, which is really that the idea here is that is this a term of employment affecting employees, or is this something so entrepreneurial in going to the core of the employer's business, such as the decision to be in business at all, that there should be an exception from the act where it's not required to go through bargaining? Is the board really going to take the position that maintaining safety is not a core part of the business of one of the biggest chemical and manufacturing companies in the United States? Safety is not a core concern of the business. Well, I think the board certainly isn't taking that position, Your Honor. What the board is saying is that that's not the business that DuPont is in. It's in the business of manufacturing synthetic fibers at this facility. At most, the safety considerations would be a component part of that. Isn't that a core component part? Isn't that a core where a company has not only responsibilities to its employees and the surrounding community, but also fiduciary duties to shareholders? Well, Your Honor, I certainly don't want to underplay the safety hazards at this facility or the important role that the ERT plays, but it's actually conceded in the records here, DuPont conceded that either under state or federal regulations or under DuPont's own policies, it actually is not required to have a first-line ERT team at all. It could instead just rely on local and county fire and EMT services. In fact, that's what it does do when there's a significant threat to life. They bring in outside support. This is primarily a first-line response at the facility. So, again, I certainly don't want to underplay. Obviously, safety is in the interest of all parties, but the board's point is that under FIBER Board and under the Act, if this is not going to the sort of entrepreneurial business that the employer is in and it's not outside the range of bargaining for other reasons, such as non-labor cost motives, then under federal labor law that's required to go through the collective bargaining process. I hear you saying that safety for a company like this is not part of the entrepreneurial considerations of the company. Is that your position? Yes, that is the position, Your Honor, but I note that I don't really think that framing of it is relevant in this case because there's certainly no evidence in the record that the employer needed to do this to preserve the safety of its employees. If that were in the record, I wouldn't want to prejudge the case, but I imagine the board would find that it is non-bargainable. In fact, there is the case Oklahoma Fixture, which is cited in the briefing. You can certainly have an exception based on safety to collective bargaining, but in this case, there simply is not evidence, number one, that the contractor model was necessary to preserve safety, but number two, it's not a reasonableness inquiry for the board or this court. It's a question of what were the employer's motives when it made this decision, and we would submit that overwhelming substantial evidence supports the board's finding that labor costs were at least a significant motive and that the employer has not shown that its upper management was actually relying on another motivation, and I think at that point it's essentially a factual or evidentiary issue before the court. Is it the board's position that, as the ALJ also articulated it, that labor costs being a significant consideration is sufficient to require mandatory bargaining, even if there are core entrepreneurial motivators that are also a decision or perhaps a part of the decision or perhaps even a primary driver in the decision? No, that's not the board's test, Your Honor, and in fact, that is the analysis that the board will perform even under Torrington Industries  which is to say this was this type of subcontracting motivated by labor costs, but are there other non-labor cost motives which would preclude effective bargaining over this issue, and there's no delineation of primary or any kind of categorical test like that. It's ultimately a fact-based analysis, which is, I think, what this court held in furniture renters it should be, and so the board will take into consideration the facts of each case as it is here, and it's simply found on these facts in this particular case this was a subject that's amenable to bargaining. And furniture renters uses terminology like primary or what prompted the decision. Isn't that fundamentally different than the Torrington test, which it sounds like you're in substance relying on is that if the decision isn't accompanied by a change in the business itself, that it is then by default the mandatory subject of bargaining, but we've rejected that as the test, right? Yes, as a per se rule, Your Honor, although the board itself has clarified that Torrington is not a per se rule and that it will look on a case-specific basis for, you know, potential non-labor cost motives that take it outside the realm of bargaining, I would note that even if there is some hypothetical tension between furniture renters and Torrington Industries, I don't think this is necessarily the case where the court would need to get into that because here, regardless of what Torrington Industries says, the ALJ, as affirmed by the board, did a very detailed analysis of the record here and of these facts. And also in terms of the primary sort of terminology, I'd also note that in furniture renters, the court, again, did approve what the board said and to be packing, which is a burden-shifting test for relocation decisions, which says, number one, were labor costs a motive, at least part of the employer's motive? And if so, then the employer has a burden to show that it had additional motives, which outweighed labor costs and would have prevented meaningful bargaining. And again, that's not directly at issue here, but the court has affirmed that as a reasonable application of the Supreme Court's decisions in Fiber Board and First National Maintenance. There's another argument that should start at one in this courtroom, so I'd ask if my colleagues have any additional questions for counsel. Just would you state briefly, please, what your request is in this case? We would request enforcement in full of the board's order as attached to the decision in order, which requires- Back to the bargaining table? Yes, it essentially requires, in brief, compensation for the employees in the form of back pay, restoration of the status quo ante, and a notice posting. However, again, the actual details of that could be litigated in compliance. So, for example, if the employer were able to come forward with sufficient evidence, it could show that restoration of the status quo ante would be inappropriate here. But we would ask now simply that the court enforce the board's order and let that be resolved through compliance. Judge Cross, any further questions in the lobby? One very brief one. You had talked about the cost savings being in the range of $1 million. In some places in the record, it looks like maybe up even up to $2 million. What weight should it carry when we look at what cost savings that actually has as to an employer that does the scale of a business with the scale of expenses, scale of revenue of a company like DuPont? Do we need to conclude that it was for the savings of $1 million that DuPont would be prepared to trade off the professional safety emergency response team for the volunteer one? Well, Your Honor, the board certainly doesn't apply any kind of, you know, quantitative standard as to what, you know, if something is de minimis or sufficiently large. I think the significance of that figure is simply that the $1 million in savings, even if that's insignificant for DuPont as a company, which I'm sure it is, that's actually approximately 50% of the ERT model. So through this contracting model, the employer was essentially able to halve its labor costs. And that's what I think is really significant. Although, again, that's not really the core of the board's analysis or essential to the board's finding. It could be a very small labor cost figure. And as long as the board found that that was in fact the motive, it would support the board's finding. Thank you. Okay. Thank you. Thank you for your argument. Let me hear a rebuttal. We'll hear DuPont. Thank you. Thank you, Your Honor. Real quickly, just two points. The first, I think Mr. Weitz admitted that the board doesn't have a primary motivation test. And I submit that under this court's case law, any motivation can't be the right standard. And so at a minimum, I think the court needs to make that clear and remand for further proceedings before the board. Because unlike Mr. Weitz, I don't see any finding in the ALJ's decision that the primary motivation here was direct labor costs. And that leads me to the second point, which is whether these recruitment issues are indirect labor costs so that you could still get to the same place that labor costs were the sole motivation, if we just categorize everything as labor costs. This is not a normal recruitment case where we're just trying to find people who, you know, don't need to have special skills and aren't providing something as intangible and hard to quantify as safety-related services. And I don't think, you know, the solution that maybe we could just require everyone to volunteer is a realistic suggestion for the bargaining table here. Because employers shouldn't have to conscript manufacturers into serving as firefighters. And I don't think, as the ALJ notes, that the standard either should be whether the current situation poses an existential threat to the enterprise. I think DuPont should be entitled under the National Labor Relations Act, if anything else, to provide more than the bare legal minimum in terms of what it is required to assure in terms of safety at its facility. And the administrative record is very clear that DuPont takes safety extremely seriously and starts every meeting with a safety tip or safety contact. And I don't think that the National Labor Relations Board has the authority to give a union the ability to block a change that I think no one disputes was a sound change from the point of view of objective safety. Having full-time emergency response professionals should be something to encourage rather than hinder. And with that, we would ask that the court either set aside or at a minimum vacate and remand the board's order. Okay. Thank you very much. Thank you, counsel, for the very helpful arguments and the excellent briefing. The court will take the matter under advisement.